SO ORDERED: November 30, 2010.




Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSEPH ANDREW MCGINNIS | ) | CASE NO. 09-2027-AJM-13 |
| | ) | |
| Debtor | ) | |
| | ) | |
| JULIE MCGINNIS | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Adversary Proceeding |
| vs. | ) | No. 09-50366 |
| | ) | |
| JOSEPH ANDREW MCGINNIS | ) | |
| | ) | |
| Defendant | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Plaintiff commenced this adversary proceeding on June 24, 2009, alleging

certain debts owed to her by the Defendant, Joseph Andrew McGinnis, were

1

nondischargeable under §523(a)(2)(A) of the Bankruptcy Code.[1]  Trial on the Plaintiff's §523(a)(2)(A) claim was held on August 4, 2010 wherein the Plaintiff appeared by counsel Matthew Foster and the Defendant appeared by counsel Charleyne Gabriel.  At the conclusion of the trial, the Court took ruling on the matter under advisement and directed the parties to file post trial briefs within thirty (30) days.  The parties complied with that request, but the Defendant's chapter 13 case was dismissed prior to decision in this adversary proceeding, and thus, this adversary proceeding was likewise dismissed.  Both the chapter 13 case and this adversary proceeding have been reinstated.  Accordingly, the Court, having reviewed the briefs filed by the parties, and having considered the testimony of the witnesses, the arguments of counsel, and the evidence admitted, now makes its findings of fact and conclusions of law in accordance with F. R Bankr. P. 7052.

### *Findings of Fact*

1. The Plaintiff, Julie McGinnis ("Julie") and the Defendant, Joseph Andrew McGinnis ("Joseph") were married in 1990 and had four children by April, 2004.  After losing his job in the computer software field in April 2004, Joseph did some consulting work and worked for a golf promotions company.  In 2005, Joseph formed his own promotions company which required him to travel to Ohio frequently.  Because Joseph's credit was less than stellar, he used Julie's Target and American Express credit cards to purchase materials for his business.

---

[1] Julie's complaint also contained a claim for nondischargeability under §523(a)(15).  Although the case was first filed as a chapter 7 case, it was converted to a chapter 13 case.  Since §523(a)(15) claims are dischargeable in chapter 13 cases upon completion of the confirmed chapter 13 plan under §1328(a), the §523(a)(15) claim was dismissed.

2.      In February, 2006, the Julie discovered a text message on Joseph's cell phone directed from a woman she did not know named "Carol".  When she questioned Joseph as to the identity of "Carol", he told her she was a business acquaintance from Ohio.  When specifically asked, Joseph denied to Julie that he was having an affair with "Carol".

3.      Sometime after Julie discovered the text message in February, 2006, Julie and Joseph underwent marital counseling.  Upon the recommendation of their marital counselor, they agreed to a trial separation and Joseph moved out of the marital home in June, 2006.

4.      During the trial separation, Joseph voluntarily agreed without court order to pay Julie $4000 a month for living expenses.  Two checks, in the amounts of $1700 and $1000 bounced.  Joseph testified that he withdrew whatever dollar amounts from his bank account and gave it to Julie to make up for the bounced checks although the amount he gave her was less than the full $2700 owed as a result of the bounced checks.  He also testified on cross examination that he made a mistake as to the balance in his account which lead to there being insufficient funds in his account when the checks were presented for payment.

5.      Though separated, the parties nonetheless "dated" once a week and Joseph regularly attended church and spent the day with Julie and their children in the marital home.

6.      Julie's argument for a determination of  nondischargeability under §523(a)(2)(A) can be summarized as follows: she relied on Joseph's continuing verbal affirmation of his commitment to their marriage, and based on those representations,

3

she allowed him to use her Target and American Express credit cards to purchase product for his promotions company. Had she known the representations were not true, she would have never allowed the use of the credit cards. However, there was no testimony that Joseph misrepresented what he used the credit cards for as the evidence at trial indicated they *were* used to buy products for his promotions company.

7. There was conflicting testimony at trial as to the "representations" made by Joseph with respect to his commitment to the parties' marriage during the trial separation. Julie testified that Joseph repeatedly stated that he was committed to the marriage and that he had not and was not having an affair. Indeed, Julie testified that she didn't understand why Joseph did not move back into the martial residence as "things were going so well". Conversely, Joseph testified that, sometime in 2006, he told Julie, their children, their marital counselor, Julie's father and the family priest that he had no intention of returning home and that he repeatedly made it clear to Julie that he would not return home.

8. Julie testified that there was an $800 balance on the Target credit card when she first allowed Joseph to use it for his business in October 2006. At that point, the couple was still in counseling. By August, 2007, the card balance was approximately $16,500, of which all but $2,000 had been incurred by Joseph.

9. Julie also testified that the American Express card was in her name alone and that Joseph was an authorized user. She allowed Joseph to use this card beginning in June 2006. As of that date, the card carried a balance of $5000 which Julie eventually paid off completely. As of August 2007, the card balance was $8000, all of which was attributable to charges made by Joseph.

10.　　Joseph quit his promotions company in 2007 and began working for an advertising company until 2008, when he began employment with Office Max.

11.　　In November, 2007, Julie learned that Joseph had been involved in an extra marital affair since 2005 and took steps to seek a divorce. The parties' divorce was finalized in July 2008.

12.　　Joseph filed his chapter 7 case on February 26, 2009. The chapter 7 case was converted to a chapter 13 case on July 14, 2009. Julie commenced this adversary proceeding and filed her complaint to determine dischargeability on June 24, 2009.

### *Conclusions of Law*

1.　　The Plaintiff alleges that the Debt is nondischargeable under §523(a)(2)(A). Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." 11 U.S.C. § 523(a)(2).

2.　　Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992). A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).

3.　　Section 523(a)(2)(A) list three separate grounds for dischargeability: actual fraud, false pretenses and false representation. Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three

grounds and has formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground.  *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).  The Plaintiff is relying on the "false pretenses/ false representation" grounds of §523(a)(2)(A).

4. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor obtained money, property or services through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitute a willful misrepresentation; (2) the debtor possessed scienter, i.e. an intent to deceive; and (3) the creditor justifiably relied on the false representation to his detriment.  *Scarpello*, 272 B.R. at 700.

5. A misrepresentation can occur not just though a verbal representation, but also through a debtor's conduct that was intended to create a false impression, but the representation – regardless in what form made – must be with respect to a material fact. *Scarpello*, 272 B.R. at 700.

6. Proof of intent to deceive is determined by a review of all of the relevant factors of the particular case and is measured by the debtor's subjective intention *at the time the representation was made*.  Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. *Mayer v Spanel International, Ltd (Matter of Mayer),* 51 F.3d 670, 673 (7th Cir. 1995); *Bletnitsky v. Jairath (In re Jairath),* 259

B.R. 308, 314 (Bankr. N. D. Ill. 2001).

7. Reliance on the false pretense or false representation must be justifiable, which at least one court has described as an "intermediate level of reliance". *Scarpello*, 272 B.R. at 700. This intermediate level of reliance "imposes no duty to investigate unless the falsity of the representation is readily apparent". *Scarpello*, 272 B.R. at 700. Whether there was justifiable reliance by the creditor is measured by a subjective standard; that is, the creditor must show that the debtor "made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *Mayer*, 51 F.3d at 676.

8. However, the "representation" may not be material if it concerned something that was known equally or better to the plaintiff than to the defendant. Under such circumstances, the "representation" is not material and therefore cannot serve as the cause of the debt the creditor seeks to except from discharge. *Mayer*, 51 F.3d at 676.

9. The evidence at trial established that the parties' marriage had hit difficult times as early as 2005. The couple underwent marital counseling soon after Julie's discovery of the text message from "Carol" in February 2006. The Court finds Julie's insistence that she believed Joseph's "representations" of how he was not involved with "Carol" inconsistent with her agreement to undergo marital counseling shortly thereafter. Why would marital counseling be necessary if the infamous text message was from just a business associate?

10. Julie continued to allow Joseph to use the credit cards after June, 2006, even though he had moved out of the marital residence and (by his account) made it clear to family members and clergy that he was not moving back.

11.     Furthermore, Joseph did not lie about *how* he intended to use Julie's Target and American Express credit cards ; Joseph testified they were used for business purposes and Julie did not produce any credible evidence to suggest otherwise.  The income earned from the sale of merchandise purchased with the credit cards was used, in part, to pay Julie a monthly payment of $4000 to cover living expenses for her and the children.

12.     The Court concludes that Julie has not proved by a preponderance of the evidence that Joseph made false representations as to his continued commitment to the marriage during the pertinent time period beginning in February, 2006, as there was conflicting testimony that Joseph made it clear that he would not return to live in the marital home.  And, to the extent he made such misrepresentations, Julie could not have justifiably relied on them given their marital difficulties that began in 2005 and Joseph's move from the residence in June, 2006.  The disconnect between Julie's reliance on alleged statements of commitment to the marriage while simultaneously living apart with no sign on Joseph's part to move back cannot be ignored.

13.     The Court also concludes that Julie failed to prove by a preponderance of the evidence that the bounced checks for $1000 and $1700 are nondischargeable.  The mere writing of a check that later is returned for insufficient funds is not a "false statement" and thus is not a false representation for §523(a)(2)(A) purposes.  *Scarlata*, 979 F.2d at 525.  Furthermore, Joseph testified that he miscalculated the amounts in his account which led to the bounced checks and that he withdrew what he had in his account to make good on them.

14.     The Court concludes that Julie has not proven the elements of §523(a)(2)(A)

8

and therefore the debt owed to her by Joseph is dischargeable.  The appropriate judgment will be entered.

###

Distribution:

Matthew W. Foster, Attorney for the Plaintiff
Mark Zuckerberg/ Charleyne Gabriel, Attorneys for the Defendant
Case Trustee